

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 1611 | **DATE** | 12/13/2000 |
| **CASE TITLE** | Laura Barr-Carr vs. Jerry R. Eggers, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant City of Chicago's and Defendants Angel Perez and Renee Kalinowski's Motion to Dismiss and for Fees and Costs Pursuant to Rule 11 of the Federal Rules of Civil Procedure is granted and awards Defendants their fees and costs. All other motions are hereby terminated. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 1 4 2000 | 156 |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/13/2000 | |
| VKD | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | VKD6 mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MITCHELL BOGDAN, | ) | Case No. 96 C 1609 |
| Plaintiff, | ) | |
| v. | ) | Magistrate Judge |
| | ) | Arlander Keys |
| JERRY R. EGGERS, Star #15548, et al., | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| LAURA BARR-CARR, | ) | Case No. 96 C. 1611 |
| Plaintiff, | ) | |
| v. | ) | |
| JERRY R. EGGERS, Star #15548, et al., | ) | **DOCKETED** |
| Defendants. | ) | DEC 1 4 2000 |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant City of Chicago's ("City") and Defendants Angel Perez and Renee Kalinowski's[1] Motion to Dismiss and for Fees and Costs Pursuant to Rule 11 of the

---

[1] Defendant Jerry R. Eggers died in an automobile accident on December 2, 1999. Consequently, Defendants filed a Rule 25 Motion to dismiss Mr. Eggers as a party. Because Plaintiffs did not timely move to substitute parties, on September 14, 2000, the Court dismissed Mr. Eggers as a party to this litigation.

-1-

Federal Rules of Civil Procedure. Plaintiffs Mitchell Bogdan and Laura Barr-Carr allege various civil rights violations against two Chicago police officers, the City of Chicago, and the operator of a service station.[2] Because the Court finds that Plaintiffs brought this case for an improper purpose, and, in fact, concocted this litigation, the Court grants Defendants' Motion to Dismiss and awards Defendants their fees and costs.

## BACKGROUND

Because of the drastic Rule 11 sanction imposed in this case (*e.g.*, dismissal and awarding of fees and costs), an extensive narrative of the facts is warranted. *See Insurance Benefit Administrators, Inc. v. Martin*, No. 84 C 10355, 1989 WL 157722, at *3 (N.D. Ill. Dec. 18, 1989) ("Determining the appropriateness of Rule 11 sanctions is a fact intensive inquiry. . .") (citation omitted).

### A. Plaintiffs' Allegations of Police Misconduct.

On March 20, 1995, Plaintiff Ms. Barr-Carr accompanied

---

[2] On October 10, 1999, the Court dismissed Plaintiffs' Section 1983 claim against the City. Additionally, on July 11, 2000, the Court dismissed the operator of the service station as a Defendant in this litigation. Consequently, the present case is against Officers Angel Perez and Renee Kalinowski (and the City if it is found vicariously liable). (Officer Perez is only implicated in Mr. Bogdan's Complaint.)

Plaintiff Mr. Bogdan to the Citgo Service Station at 5200 West Addison St. in Chicago, Illinois ostensibly to learn the identity of a witness to Mr. Bogdan's earlier arrest at that station on October 19, 1994. During their pursuit of this supposed witness, Ms. Barr-Carr allegedly identified herself to the Citgo station manager as a member of the Chicago Police Department's Office of Professional Standards ("OPS"). After Ms. Barr-Carr refused to produce identification, the station manager called 911 and Officers Eggers and Kalinowski responded to the scene. Although Ms. Barr-Carr informed these officers that she was from OPS, she, again, refused to produce identification. Consequently, Officers Eggers and Kalinowski arrested both Plaintiffs, transported them to the 25th District police station, and charged them with impersonating police officers.

According to Ms. Barr-Carr and Mr. Bogdan, at their March 20th arrest at the Citgo station, the police officers exerted excessive force, without provocation. Ms. Barr-Carr also maintains that she was ultimately strip searched at the 25th District. In their respective Complaints (which were consolidated), Plaintiffs allege assault, battery, excessive force, conspiracy, false arrest, and malicious prosecution stemming from their March 20th arrest at the Citgo station.

On July 6, 1995, Plaintiffs failed to appear in a timely manner for their hearing (dealing with the charges stemming from the March 20th incident) at the Cook County Circuit Court located at 13th Street and Michigan Avenue. As a result, the judge issued a bond forfeiture warrant and dismissed the officers. As the Defendant officers were leaving the courthouse, they encountered Plaintiffs, and advised them to hurry to the courtroom to speak with the judge. Two of the officers accompanied Plaintiffs in the elevator to the courtroom. According to Ms. Barr-Carr, Officer Kalinowski and another officer forcibly pulled her and Mr. Bogdan into the elevator, called her a "smart-ass nigger", and ultimately paraded them into the courtroom. Ms. Barr-Carr maintains that these incidents were observed by many people, including one witness, Mr. Kelly Ofoma,[3] who gave her his name and address. Plaintiffs allege this incident as an additional false arrest claim.

### B. The Appointment of Attorneys from Seyfarth Shaw Fairweather & Geraldson to Represent Ms. Barr-Carr.

Ms. Barr-Carr has had at least three sets of attorneys who

---

[3] Ms. Barr-Carr initially implied in her deposition (and to her lawyers at Seyfarth Shaw Fairweather & Geraldson) that she had not previously known Mr. Ofoma and that he randomly, and voluntarily, came up to her at the courthouse and said that he would be a witness to her alleged abuse by the officers. As explained in more detail *supra*, however, Ms. Barr-Carr had, in fact, previously known Mr. Ofoma, who had dated her sister and had lived in her mother's house in 1995.

have all withdrawn from her case. Although Ms. Barr-Carr initially filed her Complaint *pro se*, she retained counsel, who filed their appearances on May 8, 1996, and filed an Amended Complaint on July 16, 1996. On September 10, 1996, Ms. Barr-Carr's first set of attorneys filed a motion to withdraw, citing disagreements with Ms. Barr-Carr regarding litigation strategy and, on September 27, 1996, Ms. Barr-Carr filed a motion for appointment of new counsel. On September 30, 1996, Ms. Barr-Carr's attorneys' motion to withdraw was granted. On February 10, 1997, Ms. Barr-Carr renewed her motion for appointment of new counsel and, on March 24, 1997, counsel from Seyfarth Shaw Fairweather & Geraldson ("Seyfarth Shaw") filed their appearance on behalf of Ms. Barr-Carr pursuant to their appointment by the Court on February 27, 1997.

Counsel from Seyfarth Shaw diligently propounded and answered discovery, took and defended numerous depositions and filed a motion to compel discovery and a final pre-trial order. Seyfarth Shaw spent thousands of dollars of its own resources investigating and preparing Ms. Barr-Carr's case, which was set for trial on November 8, 1999. However, on October 13, 1999, counsel at Seyfarth Shaw sought to be relieved of their February 27, 1997 appointment as Ms. Barr-Carr's counsel on the basis that they had recently received information which had caused them to seriously

question their ability to continue to vigorously represent Ms. Barr-Carr consistent with their ethical obligations. Because of the sensitive nature of this issue (involving attorney-client and work product privileged information), on October 20, 1999, this Court conducted an ex parte, on the record, hearing with Ms. Barr-Carr and her attorneys. The tape recording of the hearing and privileged documents tendered to the Court by counsel were, at that time, placed under seal.[4]

However, on September 12, 2000, this Court, finding that the attorney-client and work product privileges were outweighed by the potential fraud on the Court and abuse of the judicial process, and in the interests of justice, ordered the unsealing of the evidence and documentation adduced at the October 20, 1999 hearing, and directed that the audio tape of the hearing be unsealed and transcribed. The present motion before the Court, arguing that Plaintiffs concocted this litigation, is largely based on information derived from Seyfarth Shaw's investigation of Ms. Barr-Carr's allegations.

---

[4] The in-office notes and memoranda of Seyfarth Shaw counsel regarding their investigation, conversations with Ms. Barr-Carr and others and their mental impressions derived therefrom, were initially protected from disclosure by both the attorney-client privilege and work product doctrine.

## C.    Seyfarth Shaw's Investigation (Unsealed)

On October 5, 1999, Noah Finkel, an attorney at Seyfarth Shaw, prepared a memorandum (which has been unsealed) describing his pre-trial investigation of Ms. Barr-Carr's claims of police brutality. The following facts are relayed in this memorandum:

According to Mr. Finkel, Mr. Ofoma, whom Ms. Barr-Carr identified as a witness to the alleged July 6th courthouse incident, told Mr. Finkel, in no uncertain terms, that (1) he was not at the 13th and Michigan courthouse on July 6th, and in fact, had never been to that courthouse; (2) he knew Ms. Barr-Carr[5] because he had previously dated her sister and had lived with Ms. Barr-Carr's mother – not because he had observed an incident on July 6th; and (3) on March 21, 1995, Ms. Barr-Carr and Mr. Bogdan had arrived at the McClerking residence (where Mr. Ofoma was living) and informed Ms. Barr-Carr's mother, Ms. Barr-Carr's sister, Jacqueline, and Mr. Ofoma, that she and Mr. Bogdan had been arrested the previous night and, while not hurt, she was going to the hospital anyway so that she could sue the police officers.

Mr. Ofoma also told Mr. Finkel that Ms. Barr-Carr had asked

---

[5] Mr. Ofoma, actually, did not know a Laura Barr-Carr but knew a Laura McClerking, because he had dated her sister, Jacqueline McClerking.  McClerking is Laura's step father's name, and is the same person as Laura Barr-Carr.

him, on more than one occasion, to testify for her in her police brutality case, but that he had refused, saying that he had not witnessed anything, and therefore, would not lie. According to Mr. Ofoma, Ms. Barr-Carr had responded that he should lie for her because he was dating her sister, and that, if he got some of his friends to testify that they had witnessed the March 20, 1995 incident, then she would give them a portion of her winnings. Ms. Barr-Carr also told Mr. Ofoma that she was planning on getting some people from the "projects" to testify for her. Additionally, Mr. Ofoma informed Mr. Finkel that Mr. Bogdan – who at some point had called Mr. Ofoma – was afraid of Ms. Barr-Carr, did everything she said, was afraid to "cross her", and that Ms. Barr-Carr had convinced him to file a suit against the officers. Finally, Mr. Ofoma warned Mr. Finkel that he should not involve himself in Ms. Barr-Carr's case because he could lose his license.

After speaking with Mr. Ofoma, Mr. Finkel called Ms. Barr-Carr's mother to corroborate either Mr. Ofoma or Ms. Barr-Carr's version of events. Ms. Barr-Carr's mother, however, refused to speak with Mr. Finkel, saying that her daughter could take care of herself. Mr. Finkel then spoke to Ms. Barr-Carr to inform her that Mr. Ofoma, her own witness, had contradicted her version of events, and, moreover, had implied that she was concocting this litigation.

Ms. Barr-Carr, then, admitted that she had known Mr. Ofoma before their "chance" meeting at the courthouse, because he had worked with a friend of hers, "or something like that." When Mr. Finkel informed Ms. Barr-Carr that Mr. Ofoma had said that he was not at the courthouse on July 6, 1995, and, indeed, had not witnessed anything, Ms. Barr-Carr responded that Mr. Ofoma was a liar. When Mr. Finkel queried Ms. Barr-Carr as to whether Mr. Ofoma had any reason to lie and whether he had dated her sister, she stated that she did not know why he would lie (but would find out), and that her sister had dated lots of people, so it was possible that her sister, in fact, had dated Mr. Ofoma. Mr. Finkel told Ms. Barr-Carr that he would like to talk with her mother and her sister about some of the things that Mr. Ofoma had told him, whereupon, Ms. Barr-Carr replied that she did not know where her sister lived and that her mother was too ill to talk to him. When Mr. Finkel informed Ms. Barr-Carr that he had already attempted to talk with her mother, who would not answer any questions without Ms. Barr-Carr's permission, Ms. Barr-Carr refused Mr. Finkel's request to tell her mother that she could answer his questions, stating that her mother's doctor had ordered her to avoid "stressful situations."

On October 13, 1999, Mr. Finkel prepared a second memorandum,

describing his efforts to investigate, and corroborate, Ms. Barr-Carr's version of events, and to try to determine why Mr. Ofoma would lie. In this regard, Mr. Finkel spoke to Mr. Ofoma again, who provided more details about his past relationship with Jacqueline McClerking (Ms. Barr-Carr's sister), Ms. Barr-Carr, and their mother. According to Mr. Ofoma, he had lived at the McClerking residence for about a year before Ms. Barr-Carr's arrest in March 1995, and then for another six months after her arrest. He said that Ms. Barr-Carr often slept on the couch at the residence, and that she had been in Florida and Georgia for extended periods of time before the arrest, but, he believed, was living in Chicago at the time of her March 1995 arrest. He also informed Mr. Finkel that, during this time, he grew increasingly uncomfortable as Ms. Barr-Carr continually asked him to lie for her regarding this lawsuit.

Mr. Ofoma further explained that, while he lived at the McClerking residence, he was running a business, in a moonlighting capacity, out of the McClerking home, and that he had installed a fax machine at the residence. While he had initially paid the phone (and fax) bill, after his relationship ended with Jacqueline, he, admittedly, did not pay a phone bill estimated at about $1500-2000. (Mr. Ofoma explained that Jacqueline had refused to return

his belongings, worth thousands of dollars, and that was why he had not paid the phone bill.) Mr. Ofoma further noted that he had not heard about the unpaid phone bill for at least three years, and that he had never been contacted by a lawyer, or threatened with legal action.

When asked about his contact with Ms. Barr-Carr since 1995, Mr. Ofoma explained that he had talked to Ms. Barr-Carr approximately three times since 1995. First, he had seen her several years earlier in downtown Chicago, where she, again, asked him to testify for her regarding this lawsuit. He also said that he had seen Ms. Barr-Carr about a year earlier, and that she had asked him if he would at least talk to her lawyer. At this meeting, he did give her his phone number. Mr. Ofoma then stated that Ms. Barr-Carr had called him the prior evening, after Mr. Finkel had spoken to him, and had informed him that he owed her mother at least $10,000 for the unpaid phone bill, that he was lying, and that she was going to sue her lawyers for not contacting him until a year after she had provided his address to them. Mr. Ofoma informed her that she had no case, no right to sue anyone, and that she should get a job if she wanted money.

During this second conversation with Mr. Finkel, Mr. Ofoma reiterated that he was not at the courthouse on 13th and Michigan

on July 6, 1995, and that he did not even know there was a courthouse there. Furthermore, he stated that he had been working at a nursing home between 7 a.m. and 3 p.m. during this time period, and therefore, would not have been at a courthouse during business hours. He also offered more details about Ms. Barr-Carr's arrest on March 20, 1995, saying that she had never mentioned, on March 21, 1995 at the McClerking residence, that she had been strip searched, but had merely remarked that a female officer had aggressively patted her down looking for weapons. Mr. Ofoma also informed Mr. Finkel that Mr. Bogdan had called him, complaining that Ms. Barr-Carr was verbally insulting and threatening him.

During his investigation, Mr. Finkel also spoke to Jacqueline McClerking on October 6, 1999. According to Mr. Finkel, Jacqueline was short on the phone, and apparently, reluctant to talk with him, especially about her past relationship with Mr. Ofoma. While she admitted knowing him, she would not explain how or in what context. She did, however, admit that he had spent the night with her at her mother's house on occasion, and that he had, indeed, ran up a phone bill. Jacqueline further stated that Ms. Barr-Carr was hurt when she had returned to the residence on March 21, 1995, and that she had to go to the hospital because some officers had beaten her up. Finally, Jacqueline stated that she was in frequent communication

with Ms. Barr-Carr, and had, indeed, spoken to her about four or five days earlier.

Mr. Finkel then spoke to Attorney Maurice Liebman, who was Ms. Barr-Carr's mother's attorney, to verify whether litigation had been threatened (or at least considered) against Mr. Ofoma for not paying the phone bill. While Mr. Liebman confirmed that he represents Ms. Barr-Carr's mother, he stated that he had never heard of Mr. Ofoma, and that no phone bill litigation had been contemplated.

On October 19, 1999, William Skalitzky, another attorney at Seyfarth Shaw, prepared a memorandum describing his meeting with Ms. Barr-Carr on October 8, 1999. At this meeting, Mr. Skalitzky informed Ms. Barr-Carr that he wanted to confirm that her mother was, indeed, suing Mr. Ofoma for the unpaid phone bill. (Apparently, Ms. Barr-Carr's "new" theory, that she had articulated to Mr. Finkel on October 6, 1999, was that Mr. Ofoma was lying in his October 1999 conversations with Mr. Finkel, because he was upset about litigation over the 1995 unpaid phone bill.) Ms. Barr-Carr insisted that Attorney Liebman was representing her mother in a bankruptcy case and in the case against Mr. Ofoma. When Mr. Skalitzky informed her that Mr. Liebman had never heard of Mr. Ofoma, Ms. Barr-Carr responded that Mr. Liebman might be lying

because of the attorney-client privilege. After informing Ms. Barr-Carr that Mr. Liebman had not asserted the privilege, and that it would not have applied anyway, Ms. Barr-Carr said that Mr. Liebman should "open his ninety-year old eyes" and see Mr. Ofoma's name.

Mr. Finkel (who was present at this October 8th meeting with Mr. Skalitzky) then informed Ms. Barr-Carr that Mr. Ofoma had admitted that he had not paid a 1995 phone bill for about $1500-2000, but that no one had ever threatened litigation, and therefore, he would have no reason to lie when he said that he was not present at the courthouse on July 6, 1995. Ms. Barr-Carr proceeded to offer various explanations, at this October 8th meeting, as to why Mr. Ofoma would lie: (1) he was married when he was dating Ms. Barr-Carr's sister, Jacqueline, in 1995; (2) he owed a lot of women money and, perhaps, someone was paying him to lie; (3) he was working for the government in an unknown capacity and could not become involved in litigation, and (4) he was upset because Ms. Barr-Carr's mother had called the police on him in 1995 when he had refused to leave her home. Ms. Barr-Carr also stated that Mr. Ofoma, her own witness, was a con artist and was presently being investigated and would be disclosed as a liar, and that Seyfarth Shaw should contact his former employer to confirm that he

-14-

' was a liar.

Jeff Ross, another Seyfarth Shaw attorney present at this meeting, asked Ms. Barr-Carr for her sister Jacqueline's pager number to confirm various allegations. Ms. Barr-Carr responded that she did not remember the number, and added that she had seen her sister at their mother's home on October 6, 1999 but that, other than that, she had not seen or spoken to her sister for several months. When Mr. Finkel informed Ms. Barr-Carr that he had, in fact, spoken to Jacqueline on October 6th, and that Jacqueline had said that she and Ms. Barr-Carr were in frequent contact and had spoken five days earlier, Ms. Barr-Carr replied that her sister was lying and trying to make it appear as if they were closer than they really were.

At the conclusion of the October 8th meeting, Mr. Skalitzky explained to Ms. Barr-Carr that they could not ethically represent her if they reasonably, and in good faith, believed that she was lying and would commit perjury on the witness stand. He further explained that her own witness, Mr. Ofoma, contradicted her claims, and that, based on Seyfarth Shaw's investigation of her explanations (which always proved false upon confirmation), as well as a lack of any corroborating evidence, they believed Mr. Ofoma, who had no discernible motive to lie. Mr. Skalitzky, then,

specifically informed Ms. Barr-Carr that there was no corroborating or objective evidence to sustain that, (1) on March 20, 1995, ten officers had jumped on her back while she was handcuffed, and had kicked, kneed, and hit her; (2) that she had hit the back of her head on the door to the station or on the squad door while being arrested[6]; (3) that Officer Eggers had slammed her body down onto the bench in the interrogation room, injuring her stomach; (4) that she had been stripped searched at the 25th District (there was no paper work or pre-approval for a strip search, which is required); and (5) that she and Mr. Bogdan had been arrested and forcibly taken to the courtroom on July 6, 1995.[7]

---

[6] The emergency room records from Loyola Hospital on March 21, 1995 – the day after her alleged violent encounter with the officers – reveal that she had only complained of pain in her left hip and arm, that she had not complained of any stomach pain, that the physician reported that her abdomen was normal upon examination, and that the physicians concluded that she suffered an anxiety attack and referred her for possible psychiatric care. Mr. Finkel explained to Ms. Barr-Carr that these medical records constituted objective evidence that corroborated Mr. Ofoma's version that Ms. Barr-Carr was lying about her injuries stemming from March 20, 1995. Significantly, the medical records do not mention any bruises or swelling on her face or body.

[7] Ms. Barr-Carr had told Mr. Finkel that, when Officers Eggers and Kalinowski dragged her and Mr. Bogdan into the courtroom on July 6th, the bailiff told both officers, in open court, to "get your hands off those people, this is my courtroom." The transcript of the proceedings that day, however,

(continued...)

After being advised that Seyfarth Shaw felt a legal and ethical obligation to withdraw from her case, Ms. Barr-Carr insisted that she was telling the truth, and that she wanted to proceed with the litigation. She then pulled out a reddish/purplish sweater, which she claimed that she had worn on March 20, 1995, and stated that its bulkiness protected her from "more debilitating injuries." Mr. Skalitzky, while noting that the sweater did not appear thicker than ordinary sweaters, advised Ms. Barr-Carr that Seyfarth Shaw would be filing a motion to withdraw from its appointment as her counsel on two grounds: (1) Rule 11, because there was no good faith basis for the lawsuit; and (2) the ethics rules which disallow attorneys from suborning perjury or eliciting testimony on matters that they believe are not true. Finally, Mr. Skalitzky informed Ms. Barr-Carr that they would be filing the motion to withdraw on October 11, 1999, and that the hearing would be on October 13, 1999. Ms. Barr-Carr indicated that she would be present at the hearing on October 13th.

On October 21, 1999 (after the ex parte hearing on October 20, 1999), this Court recommended to Judge Gottschall that the attorneys from Seyfarth Shaw be relieved of their appointment of

---

[7](...continued)
contains no such passage.

-17-

representation of Ms. Barr-Carr, and warned that further appointments of counsel would likely encounter the same problems.[8] By November 11, 1999, Ms. Barr-Carr had retained her third attorney, Michael Vincent Connolly.

### D. Mr. Connolly Asks to Withdraw As Counsel

On September 11, 2000, after several failed settlement attempts, and the postponement of trial from July 24, 2000 to September 18, 2000 (because Mr. Bogdan had been involuntarily committed to the Chicago Reed Mental Health Center), the Defendants submitted a motion requesting the unsealing of the October 20, 1999 hearing (where the Seyfarth Shaw lawyers had asked to withdraw), and accompanying documentation, believing that the Plaintiffs were abusing the legal system. On September 15, 2000, after the Court had granted, on September 12, 2000, the Defendant's motion to unseal the October 20, 1999 hearing documents, Defendants filed a Motion to Dismiss this case pursuant to Rule 11. In addition, on September 15, 2000, after having reviewed the unsealed documents concerning Seyfarth Shaw's investigation, Mr. Connolly submitted a

---

[8] Pursuant to Local Rule 73.1, this case was reassigned to this Court on January 26, 2000. On June 6, 2000, this Court granted Seyfarth Shaw's motion and allowed them leave to withdraw their appearance as Ms. Barr-Carr's attorneys.

motion to withdraw as Ms. Barr-Carr's counsel[9], and Corinth Bishop II, Mr. Bogdan's attorney, similarly filed a motion to withdraw as Mr. Bogdan's counsel. The Court granted both attorneys' motions and, also, granted Mr. Bogdan's motion to continue the trial that was to begin on September 18, 2000.[10]

### E. Mr. Ofoma's Testimony at the September 15, 2000 Hearing

At the September 15, 2000 hearing, in support of their Rule 11 Motion to Dismiss this case, Defendants brought in Mr. Ofoma to testify about how Ms. Barr-Carr had continually asked him to lie and commit perjury, how Ms. Barr-Carr had indicated that she was

---

[9] In support of his motion to withdraw, Mr. Connolly stated, at the September 15th hearing, "I finally have been convinced, in the face of what's going on, that this is not something I can present to the Court. I can't ask [Ms. Barr-Carr] to stand up there and tell her story. If I ask her to tell her story and then it turns out later that she's stating things inaccurately, then my license is in jeopardy, and I don't want that to happen." (Transcript of September 15, 2000 hearing ["Tr. of Sept. 15 hearing"] at 10.)

[10] Apparently, Mr. Bogdan was in a nursing home, and his attorney, Ms. Bishop, did not know when he would be released. Because Mr. Bogdan was Ms. Barr-Carr's primary witness listed on the pre-trial order, the Court felt that the cases should not be severed (and Ms. Barr-Carr's case set for trial), because Ms. Barr-Carr's primary witness, Mr. Bogdan, was incapacitated and would, consequently, not be present to testify. Therefore, the Court continued the trial that was set for September 18, 2000. (The Court did not set a new date for trial, however, because the Court was going to consider the Defendants' Rule 11 Motion to Dismiss.)

not hurt after the March 20, 1995 encounter with the Defendant officers, and how he had not been present at the courthouse on July 6, 1995. At this hearing, the Court was able to carefully observe the testimonial demeanor of Mr. Ofoma and to make credibility assessments.[11]

During his direct examination by the Defendants, Mr. Ofoma testified that, on March 21, 1995, at the McClerking residence, where he was living, Ms. Barr-Carr – who was accompanied by Mr. Bogdan – claimed that she and Mr. Bogdan had been arrested by police officers the previous night. When asked if she was injured, Mr. Ofoma testified that Ms. Barr-Carr had said no, but that she was going to see a doctor anyway because she "wanted to get paid". (Tr. of Sept. 15th hearing at 31-33.) When asked what he meant by "wanted to get paid," Mr. Ofoma clarified that she was going to "sue the police officer." (*Id.* at 33.) Mr. Ofoma further testified that Ms. Barr-Carr told him that she did, in fact, go to the hospital, but that the doctor told her that there was nothing wrong with her and put a hot pad on her back. (*Id.*) Mr. Ofoma also testified that Ms. Barr-Carr had not mentioned, on March 21st,

---

[11] Although, at the September 15th hearing, the Court had granted Mr. Connolly's motion to withdraw as Ms. Barr-Carr's counsel, the Court appointed him as "shadow counsel" during the in-court testimony of Mr. Ofoma.

that she had been strip searched the previous night, but did state that Mr. Bogdan had been searched. (*Id.* at 34.) He further stated that, on March 21st, he had not noticed any bruises on either Ms. Barr-Carr or Mr. Bogdan. (*Id.* at 39.)

With respect to July 6, 1995, Mr. Ofoma testified that he had, unequivocally, never been to the 13th and Michigan courthouse, and was certainly not there on July 6, 1995.[12] (*Id.* at 34, 39.) He also testified that, despite his not being there or witnessing anything, Ms. Barr-Carr had repeatedly asked him to provide testimony about the July 6th incident at the courthouse, and also stated that she had enlisted support from people in the projects to testify on her behalf.[13] (*Id.* at 35.) Finally, Mr. Ofoma testified that, when he eventually was contacted by Mr. Finkel and an

---

[12] Specifically, when asked if he was at 13th and Michigan on July 6th, Mr. Ofoma responded, "Over my dead body, no." (*Id.* at 34.)

[13] Specifically, Mr. Ofoma testified: "Well, she [Ms. Barr-Carr] wanted me to state that I was there when they strip searched her, and I explained to her – First of all, I said yes, but later I told her, I said no, because I don't want to come and lie in the court, you know, because it would be perjury." (*Id.* at 35). He further stated: "Well, she [Ms. Barr-Carr] told me she have call some people at the projects to help her out, sisters, aunt, friends that live in the project. And so she asked me if I could help her to state that I was in the court, so I told her, I said, but I don't know where the court is. I've never been there before." (*Id.*)

investigator concerning his alleged eye-witness account of the July 6th incident, he told them that Ms. Barr-Carr's case was "bogus", stating " . . . number one, I wasn't there. Number two, I don't know which court she's talking about. Number three, she called me harassing me on the phone, you know, why I didn't testify for her, you know. So I told him [investigator from Seyfarth Shaw] it is bogus, and I don't want to be a part of it." (*Id.* at 37.) Mr. Ofoma also testified that he warned Mr. Finkel not to get involved in this case because he could "lose his license", and that he (Mr. Ofoma) would be willing to speak to the Judge about Ms. Barr-Carr's requests for him to commit perjury. (*Id.* at 40.)

During his cross-examination by Ms. Barr-Carr,[14] Mr. Ofoma freely acknowledged that he had dated her sister, Jacqueline McClerking, in 1995 and was, indeed, living at the McClerking residence in March 1995, and had left the residence months later without paying a phone bill of approximately $2000. (*Id.* at 40-43.) When Ms. Barr-Carr asked him whether he was trying to "sabotage the case" to avoid paying the delinquent phone bill, Mr. Ofoma replied, "Which case? You don't have any case. There is no case. You are

---

[14] Although Mr. Connolly was present as "shadow counsel," he did not ask Mr. Ofoma any questions during Ms. Barr-Carr's cross-examination of Mr. Ofoma.

a liar." (*Id.* at 43.) When Ms. Barr-Carr suggested that Mr. Ofoma was lying because her mother had thrown him out of the house and had a police report filed against him, Mr. Ofoma responded, "Your mother never, for one day, did anything bad. I'm not going to talk about your ma."[15] (*Id.* at 52.)

Similarly, when Ms. Barr-Carr asked him whether there was a reason why he was lying about his testimony, and whether he was getting paid to lie, Mr. Ofoma answered, "No, I will not let you destroy whom (inaudible), no. I'm not going to let you do that. No. You want me to lie for you? I'm not going to do that. . . You called me and begged me to lie for you." (*Id.* at 47.) While admitting that, at one point, he had considered lying for Ms. Barr-Carr, Mr. Ofoma testified, "So, she called me and asked me to help her in the case. So I said okay. So after a while I (inaudible) to her, I said, I called her back and I said, I'm not going to lie. These people might lose their job. I say I'm not going to lie." (*Id.* at 48.)

---

[15] While Mr. Ofoma maintained that there was no police report, he did acknowledge that he had had a fight with Jacqueline McClerking, and that she had started to chase him around with a knife. Consequently, Mr. Ofoma testified that he called the police because he feared for his safety. After the police arrived, they told him to leave the residence. (*Id.* at 53-54.)

Finally, when Ms. Barr-Carr asked him whether he had told Mr. Finkel that Mr. Bogdan was afraid of her, Mr. Ofoma responded, "Oh, yeah, he was afraid of you. Because he called me. He called me and he told me you were pushing him. Oh, yes. He told me that." (*Id.* at 50.) Mr. Ofoma then explained to the Court that Ms. Barr-Carr was harassing him with phone calls imploring him to commit perjury. (*Id.* at 51.)

After the completion of Ms. Barr-Carr's cross-examination of Mr. Ofoma, the Defendants requested that they be allowed to amend their Rule 11 Motion to Dismiss based on the in-court testimony of Mr. Ofoma at the September 15th hearing. The Court granted this request, stating that the Amended Motion to Dismiss (the present motion before the Court) was due September 22, 2000, and also informed Ms. Barr-Carr that she needed to respond to the Amended Motion within 21 days (October 13, 2000).[16] The Court indicated that no Reply from Defendants would be necessary.[17]

---

[16] The Court suggested that Ms. Barr-Carr attempt to obtain another attorney to contest Defendants' Rule 11 Motion to Dismiss, but admonished her that any attorney should familiarize him or herself with the file (including the unsealed documents and the transcript of the September 15th hearing), because the Court was not going to grant any other motions to withdraw. (*Id.* at 66.)

[17] Ms. Barr-Carr's Response to Defendants' Motion to Dismiss

(continued...)

-24-

**F.    The Court's November 15, 2000 Hearing**

At the September 15, 2000 hearing, Ms. Barr-Carr had claimed that she had witnesses who would testify concerning her versions of the incidents of March 20, 1995 and July 6, 1995, but that these witnesses had, erroneously, not been disclosed in the Final Pretrial Order.    Because of the seriousness of the allegations raised in Defendants' Motion to Dismiss, the Court granted both Plaintiffs a hearing where they could bring any witnesses to corroborate their allegations.[18]    Therefore, although the Pretrial Order had listed Mr. Bogdan as her primary witness, the Court, giving the now *pro se* Plaintiff every opportunity to rebut the Motion to Dismiss, informed her, on October 23, 2000, that there

---

[17](...continued)
and for Fees and Costs Pursuant to Rule 11 was only one page long, and merely stated that her former attorneys were incompetent and stretched the truth, and that she was "still reeling over what [she], and other [sic]; believe to be an 'Incredible Conspiracy,' and [she was] still in disbelief as to how far unscrupulous, cold hearted, and devious human beings will go ." (Plaintiff Barr-Carr's Motion to Deny Defendants' Motion to Dismiss.)

[18] Mr. Bogdan did not respond to Defendants' Motion to Dismiss.    The Court notes that all correspondence sent to Mr. Bogdan by the Court at his last known address has been returned, indicating that his Post Office Box has been closed.    Mr. Bogdan never informed the Court, or his last attorney of record, of a change in address.    At the November 15th hearing, defense counsel indicated that Mr. Bogdan was delusional and probably homeless.

would be another hearing on November 15, 2000, where she (and Mr. Bogdan) could present any witnesses that had personal knowledge of the events of March 20, 1995 and July 6, 1995. The Court also informed Plaintiffs that they needed to inform the Court, in writing, by November 9, 2000, of the names of any witnesses they planned to present at the November 15th hearing, and the substance of their expected testimony.

At the November 15th hearing, Ms. Barr-Carr, not surprisingly, brought no witnesses on her behalf (and she also never submitted a list of witnesses by November 9, 2000). Rather, she informed the Court that she "overlooked the 9th as being the deadline" and that she still needed to "subpoena some of the records and some of the witnesses." (Transcript of November 15, 2000 hearing at 3-4.) Instead of bringing witnesses, she brought various pieces of documentation. First, she presented the Court with a letter from Mr. Ofoma's past employer that stated that he had not been at work on July 6, 1995 (thereby implying that Mr. Ofoma was at the courthouse at 13th and Michigan on July 6, 1995). She also presented a portion of the transcript from the hearing before Judge O'Malley on July 6, 1995.[19] She then complained that the attorneys

---

[19] Judge O'Malley was the judge who presided over the

(continued...)

-26-

from Seyfarth Shaw had not subpoenaed the bailiff, or other witnesses, who had observed the attack on July 6, 1995, and that the lawyers from Seyfarth Shaw did not otherwise follow-up on information that had been provided to them. (*Id.* at 20-21.)

Ms. Barr-Carr also insisted that her mother was a witness, but did not bring her to Court because she was "not well." (*Id.* at 22, 37.) Ms. Barr-Carr stated that she would, indeed, bring her mother if the Court granted another hearing. The Court explained that it had expected that Ms. Barr-Carr would have brought her mother and her sister to this hearing in order to corroborate her allegations and refute Mr. Ofoma's previous testimony if, indeed, they were able to do so. (*Id.*) Ms. Barr-Carr further insisted that there were people besides her mother, sister and Mr. Ofoma who had observed the conversation on March 21, 1995 and could refute Mr.

---

[19](...continued)
criminal charges brought against the Plaintiffs for impersonating OPS officers on March 20, 1995. The portion of the transcript that Ms. Barr-Carr brought to the November 15th hearing does not contain any evidence that she was abused by officers in the courthouse on July 6, 1995. Rather, it only reflects that Plaintiffs were late to court and informed Judge O'Malley that they had been "brutally attacked on the elevator by the police officer" who made them "stay on the elevator." Judge O'Malley, obviously not seeing any blood or bruises, merely responded, "You are lucky, because I did not enter the warrant for your arrest." Significantly, the transcript does not reflect the bailiff, or clerk of the court, saying anything to the effect of "get your hands off those people", which Ms. Barr-Carr alleges occurred.

Ofoma's testimony. When the Court asked Ms. Barr-Carr why she had not brought her witnesses into Court on November 15, 2000, as specifically ordered by the Court, she responded, "So they could be - go through things that I have been going through for five years." (*Id.* at 38.)

Ms. Barr-Carr explained that she had pictures of bruises from the March 20th attack, but the Court reminded her that the hospital records from the emergency room at Loyola Hospital indicated no bruising or scars. (*Id.* at 28.) Furthermore, the close-up, enlarged mug shot taken of Ms. Barr-Carr on the morning of March 21, 1995, which was presented in open Court, indicated no scars, bruises or swelling on her face, no cuff marks on her hand, and no dirt on her clothes. (*Id.* at 32.) Ms. Barr-Carr explained that she had a jacket, or fur coat on, that prevented her from getting injuries, and that she never said that she had been kicked in the face, but rather only on her body. (*Id.* at 35.)

At the end of the hearing, the Court indicated that it would rule on Defendants' Motion to Dismiss and make credibility determinations, based in part on Mr. Ofoma's previous in-court testimony, about whether Ms. Barr-Carr was concocting this

litigation.[20]

[20] Although the Court indicated, at the November 15th hearing, that Ms. Barr-Carr did not need to submit further documentation, the Court, nevertheless, has accepted her filing of additional documentation. The Court notes that this additional documentation is at best neutral or irrelevant, and that most of it is damaging to her case. First, Ms. Barr-Carr submitted a Georgia business license application and fee, which is irrelevant to her case. Second, she submitted part of the transcript of the July 6, 1995 hearing, before Judge O'Malley, which, importantly, does not mention the bailiff directing the officers to get their hands off Plaintiffs. Third, she submitted police records of Laura Carr (another individual) and Houston Carter. (Apparently, at some point during her criminal prosecution, her records became mixed up with these individuals, but this is clearly irrelevant to the case *sub judice*.) Fourth, she submitted a doctor's report from June 8, 1995 - more than two months after the March 20th incident- indicating that she suffered from various ailments based on what she subjectively told the doctor. Significantly, this report does not mention any broken skin, swelling or bruises. (The medical records from the Loyola ER, which were taken one day after the alleged police assault, also indicated no broken skin, swelling, or bruises.) Fifth, she submitted parts of the deposition testimony of Michael Walsdorf, an individual at the Citgo station who, according to Ms. Barr-Carr, had witnessed the police assault against her and Mr. Bogdan on March 20, 1995. His testimony, however, merely confirms that Plaintiffs were impersonating officers from OPS and that Ms. Barr-Carr began screaming and resisting arrest when Officers Eggers and Kalinowski arrived on the scene. He did not say that he observed any assault on Ms. Barr-Carr or Mr. Bogdan. Sixth, Ms. Barr-Carr submitted the sworn statements of Officers Kalinowski and Eggers, which belie her allegations of police brutality. Seventh, she submitted notes from a telephone interview of Ray Scacchitti, the Citgo Manager, who indicated that, after Plaintiffs refused to show identification that they were OPS officers to Officers Eggers and Kalinowski, that Ms. Barr-Carr began swinging her arms and resisting arrest when the officers tried to handcuff her. Significantly, he stated that the officers did not physically abuse Ms. Barr-Carr.

(continued...)

## ANALYSIS

Rule 11 of the Federal Rules of Civil Procedure allows a court to sanction a party on two grounds, namely, the "frivolousness clause" and the "improper purpose" clause.[21] *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir. 1988). The frivolousness clause requires that the party, or the attorney, conduct a reasonable inquiry into the facts and the law relevant to the case, while the improper purpose clause ensures that a "motion, pleading or other document may not be interposed for purposes of delay, harassment, or increasing the costs of litigation." *Id.* (citation omitted). The standard for imposing sanctions under either prong of Rule 11 is an "objective determination of whether

---

[20](...continued)
Furthermore, he also stated that, at the July 6, 1995 hearing (which he was attending as a witness), he did not observe any officer having any physical contact with Ms. Barr-Carr, and that Officer Eggers was not even on the elevator with Plaintiffs. Finally, Ms. Barr-Carr submitted the sworn testimony of Officer Perez concerning her arrest of Mr. Bogdan in October 1994 (which is clearly irrelevant to the case at bar).

[21] Rule 11 provides in pertinent part: "By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief . . . (1) it is not being presented for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation. . . (3) the allegations and other factual contentions have evidentiary support . . ." Fed. R. Civ. P. 11(b).

the sanctioned party's conduct was reasonable under the circumstances." *Id.* (citation omitted). Significantly, Rule 11 "enables the court to protect itself, and the litigants in other cases, from the burdens of frivolous or vexatious filings" *Frantz v. United States Powerlifting Federation*, 836 F.2d 1063, 1066 (7th Cir. 1987). "Frivolous litigation injures the judicial system and other litigants, whose day in court is postponed as judges must devote time to needless motions and heedless litigants. Courts may consider these public injuries when fixing penalties." *Id.*

Dismissal with prejudice, while drastic, is an appropriate remedy under Rule 11, as well as the inherent power of the court to curb abuse of the judicial process. "[T]he most severe in the spectrum of sanctions provided by statute or rule [dismissal] must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). Indeed, in a recent Northern District of Illinois case, the court dismissed with prejudice a litigant's case, finding that the litigants had acted wilfully and in bad faith when they coerced an employee to

lie about a central issue in the case. *Quela v. Payco-General American Credits, Inc.*, No. 99 C 1904, 2000 WL 656681 (N.D. Ill. March 26, 2000)(granting default judgment under Rule 37 and inherent power of court). While recognizing that default is "an extreme sanction," the court in *Quela*, nonetheless, held that "'[c]ourts should not shrink from imposing harsh sanctions where they are warranted.'" *Id.* at * 8 (citation omitted); *see also Pope v. Federal Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992)(citation omitted)(dismissing plaintiff's lawsuit, under court's inherent power, as a sanction for manufactured evidence and perjured testimony, stating that "[w]hen a litigant's conduct abuses the judicial process, the Supreme Court has recognized dismissal of a lawsuit to be a remedy within the inherent power of the court."); *Combs v. Rockwell International Corp.*, 927 F.2d 486, 488 (9th Cir. 1991)("Dismissal is an appropriate sanction for falsifying a deposition. Fed. R. Civ. P. 11, as well as the court's inherent power, can be called upon to redress such mendacity.").

While courts are generally more lenient with a *pro se* plaintiff, failure to investigate the factual basis for a lawsuit, or bringing a lawsuit for an improper purpose, still subjects the

*pro se* plaintiff to Rule 11 sanctions. As explained in *Schaffer v. Chicago Police Officers*, 120 F.R.D. 514, 516 (N.D. Ill. 1988), plaintiffs (including *pro se* plaintiffs) have no due process rights to proceed with litigation which violates Rule 11. *See also Pfeifer v. Valukas*, 117 F.R.D. 420, 423 (N.D. Ill. 1987)("Plaintiff's pro se status does not grant him an unfettered license to wage an endless campaign of harassment against these defendants or to abuse the judicial process. Nor does it relieve him of the duty to conduct the inquiries required by Rule 11.").

Based on these underlying principles, the aforementioned facts and an exhaustive review of the entire record, the Court finds that Plaintiffs[22] have been abusing the judicial system since 1996 and

---

[22] The Court is dismissing the case against Mr. Bogdan for the same reasons it is dismissing the case against Ms. Barr-Carr: no evidence to substantiate the claims, and evidence that the case is being brought for an improper purpose. The Court further notes that it is dismissing Mr. Bogdan's case for failure to prosecute his case. The Court has been unable to contact Mr. Bogdan since September 2000 (when his counsel withdrew), and all of its correspondence has been returned to the Court. Apparently, Mr. Bogdan closed his P.O. Box and did not give a forwarding address to this Court, which is his responsibility. Ms. Barr-Carr does not know where Mr. Bogdan currently is situated (but believes he is in his sister's care). Defense counsel indicated at the November 15th hearing that he is probably homeless and delusional. The Court also notes that it had to postpone trial on two occasions, because Mr. Bogdan was incapacitated for mental health reasons. Consequently, Mr.

(continued...)

have brought this litigation for an improper purpose, namely to harass the City and its officers and to fraudulently obtain a money verdict. The Court bases this determination not only on Seyfarth Shaw's thorough investigation (which showed that Ms. Barr-Carr continually lied, and would then change her story when confronted with the lies),[23] but also on the September 15, 2000 hearing where the Court was able to carefully observe the testimonial demeanor of Mr. Ofoma. "While a determination of credibility is generally a factual matter within the province of a jury; the 'fact-dependent legal standard mandated by Rule 11' is an issue for the district

---

[22](...continued)
Bogdan's case is being dismissed for want of prosecution and failure to give a forwarding address, as well as lack of evidence to substantiate his claims.

[23] Specifically, Ms. Barr-Carr insinuated to her attorneys at Seyfarth Shaw, and in her deposition testimony (*see* Barr-Carr's Nov. 12, 1997 deposition at 427), that she met Mr. Ofoma, for the first time, when he approached her at the 13th and Michigan courthouse on July 6, 1995 to voluntarily be a witness to the supposed police brutality. After her Seyfarth Shaw lawyers asked her if she had previously known Mr. Ofoma, she admitted that he worked for a friend of hers. When asked if he had previously dated her sister, Ms. Barr-Carr acknowledged that he might have, because her sister dated lots of people. Later on, Ms. Barr-Carr admitted that Mr. Ofoma had, in fact, lived at her mother's residence in 1995, and was at the residence after her supposed police attack on March 20, 1995. Clearly, Ms. Barr-Carr has been misleading this Court, and her own attorneys, since the inception of this litigation, and changes her story accordingly to fit the facts as they emerge.

court to determine." *Pope, supra*, 974 F.2d at 984 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990)).

Despite Ms. Barr-Carr's attempt to discredit Mr. Ofoma (by repeatedly calling him a liar, and insinuating that he was lying because he was being paid to lie, or because he held a five year grudge against her mother for allegedly filing a police report or not paying a phone bill), the Court finds that Mr. Ofoma's testimony was credible, and that he was a truthful and forthcoming witness, who was reluctant to testify and who felt genuinely threatened by Ms. Barr-Carr's harassment of him to commit perjury. His testimony in this regard was also consistent with what he had told the Seyfarth Shaw lawyers during their pre-trial investigation. The Court also notes that Mr. Ofoma has no discernible motive to lie,[24] and that the objective medical evidence fully corroborates his testimony.

Furthermore, the Court, recognizing that Ms. Barr-Carr was *pro*

---

[24] Ms. Barr-Carr's assertion that Mr. Ofoma is lying because of an outstanding phone bill belies logic. Mr. Ofoma was never sued, or threatened with litigation, over the phone bill. It makes no sense that he would commit perjury in 2000 because of a disputed 1995 phone bill over which he was never sued. It is significant that, when first queried by Seyfarth Shaw's attorneys as to whether Mr. Ofoma had a motive to lie, Ms. Barr-Carr stated that she knew of no reason, but that she would find out. Thereafter, she came up with several reasons, none of which made sense.

sè since September 15, 2000, gave her ample opportunity to rebut Mr. Ofoma's testimony and to bring in her own witnesses to state their personal knowledge of the events that transpired on either March 20-21, 1995 or July 6, 1995. Despite the Court giving her two months to bring in her witnesses (from September 15, 2000 to November 15, 2000), she brought in no witnesses at the November 15th hearing, claiming that (1) her mother was too ill (but that she would bring her in if the Court granted another hearing; and (2) bringing in her many witnesses would be subjecting them to what she had been encountering for the last five years. While the Court is not required to fire "a warning shot" before dismissing a case, (see *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 165 (7th Cir. 1994)(citation omitted)) the Court, in the case *sub judice*, indeed, warned Ms. Barr-Carr that she needed to bring witnesses to the November 15th hearing to refute Mr. Ofoma's in-court testimony on September 15, 2000. For example, Mr. Ofoma testified that Ms. Barr-Carr's mother and sister were also witnesses on March 21, 1995, when Ms. Barr-Carr reported that she and Mr. Bogdan had been arrested and that they sustained no injuries, but that she would go to the hospital anyway to support their claims of excessive force. Mr. Ofoma also testified that there were no visible signs of abuse.

-36-

Not only did Ms. Barr-Carr prevent her former attorneys from interviewing her mother and sister in this regard, she also did not present them as witnesses at the November 15th hearing. Despite the Court's "warning," Ms. Barr-Carr brought in no witnesses to the November 15th hearing, instead relying on her own self-serving assertions that everyone is against her, including her past attorneys and her alleged past witness, Mr. Ofoma.

In sum, the Court fully credits Mr. Ofoma's in-court testimony, which is unrefuted (except for Ms. Barr-Carr's self-serving accusations), and which is consistent with what he had told Ms. Barr-Carr's previous attorneys. There is no evidence whatsoever to substantiate Ms. Barr-Carr's claims[25] - she has no supporting witnesses (except, allegedly, Mr. Bogdan, who is too sick to prosecute this case and cannot be located) and no objective medical evidence. Indeed, her initial witness, Mr. Ofoma, accuses

---

[25] The only evidence that, arguably, rebuts Mr. Ofoma's in-court testimony that he was not at the courthouse on July 6, 1995, is a letter from Mr. Ofoma's former employer, indicating that its records show that Mr. Ofoma was not at work on July 6, 1995. This evidence, however, does not prove that Mr. Ofoma was at the courthouse on July 6th, but rather that he simply was not at work. Despite Ms. Barr-Carr arguing, at the November 15th hearing, that this note indicates that Mr. Ofoma is a liar, it merely indicates, as Mr. Ofoma testified on September 15th, that he was working for that employer in 1995, and believed that he would have been at work in the middle of the day.

her of suborning perjury and concocting litigation, and the medical records from Loyola Hospital on March 21, 1995 - one day after the alleged attack - indicate no bruises, swelling or broken skin, but rather suggest that she had a panic attack and recommended psychiatric care. Additionally, the close-up, enlarged mug shot, taken on March 21, 1995, shows no signs that she had been abused.

Furthermore, with respect to the July 6, 1995 courthouse incident, it belies belief that police officers, who had just been dismissed by Judge O'Malley because Plaintiffs had failed to appear, would, on their way out, abuse Plaintiffs in a public courthouse full of prosecutors, defense attorneys, judges and citizens. The transcript of the July 6th hearing, before Judge O'Malley, merely indicates that Ms. Barr-Carr stated that she had just been attacked by the officers, but significantly, (1) the bailiff, or clerk of court, did not direct the officers, as Ms. Barr-Carr alleges, to get their hands off the Plaintiffs; and (2) Judge O'Malley ignored Ms. Barr-Carr's allegations that she had just been abused in the courthouse, instead focusing on her, and Mr. Bogdan's, apparent tardiness. Clearly, if Ms. Barr-Carr had arrived at court, after just being attacked by the police officers, Judge O'Malley would, at a minimum, have commented on her accusation that she had just been abused in the courthouse. His

-38-

failure to even acknowledge her allegation of abuse illustrates that Ms. Barr-Carr tends to greatly exaggerate her claims of misconduct.

While dismissal of a lawsuit under Rule 11 is a severe sanction, courts within the Seventh Circuit have held that the court system has "zero tolerance for parties who seek to intentionally distort the discovery and trial process." *Quela*, *supra*, 2000 WL 656681 at * 7; *see also Brady v. United States*, 877 F. Supp. 444, 453 (C.D. Ill. 1994)("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.").

In the case at bar, not only did Plaintiffs file Complaints alleging police brutality on March 20, 1995 and July 6, 1995, but they presented perjured testimony at their respective depositions,[26] and manufactured facts to sustain their allegations. In her attempt to defraud the City and Defendant officers, and to abuse

---

[26] Ms. Barr-Carr's deposition, in which she claims that she, as well as Mr. Bogan, were attacked by Defendant officers, was taken on November 12, 1997. Mr. Bogdan's deposition, in which he made similar allegations, was taken on October 7, 1998.

the Court's resources, Ms. Barr-Carr suborned perjury from Mr. Ofoma. The Court will not allow such flagrant disrespect for the judicial process.

Accordingly, because the Court finds absolutely no objective medical evidence to corroborate Plaintiffs' allegations of police brutality, and because Mr. Ofoma credibly claims that Ms. Barr-Carr is lying and suborned perjury, the Court dismisses this case under Rule 11 and awards fees and costs to Defendants.[27]

## CONCLUSION

The Court, having carefully considered the matter, and for the reasons set forth above, grants Defendants' Motion in its entirety. Accordingly,

---

[27] Fees and costs are presumptively given to the prevailing party when the Court dismisses a case for abuse of the judicial process. *See Pfeifer, supra,* 117 F.R.D. at 423-24 (sanctioning *pro se* plaintiff with fees and costs against corporate defendant, noting, *inter alia,* that *pro se* plaintiff was obviously able to afford the filing fees and costs). Similarly, in the case at bar, Plaintiffs are *pro se* and, apparently, paid the filing fee and costs. In fact, except for the appointment of Seyfarth Shaw, Ms. Barr-Carr has financed her own attorneys (such as Mr. Connolly) during this litigation. (It is unclear about Mr. Bogdan's current whereabouts and financial situation). In view of Plaintiffs' egregious conduct, the Court believes that requiring Plaintiffs to pay attorneys fees and costs will not only compensate Defendants for their fees and expenses in defending this litigation, but will also deter Plaintiffs and others in the future from instituting baseless litigation and abusing judicial resources.

-40-

**IT IS HEREBY ORDERED** that Defendants' Motion To Dismiss and for Fees and Costs Pursuant to Rule 11 be, and the same hereby is, **granted.**

Dated: December 13, 2000      ENTER:

ARLANDER KEYS
United States Magistrate Judge